Please be seated. Thank you. Madam Clerk, please spell the first case. Case No. 12-3722. Madam Clerk, please spell the first case. Good morning. May it please the Court, my name is Rachel Kaplan and I represent the CTA. The CTA seeks a reversal of the Commission's decision awarding Gonzalez mental injury benefits. In this case, Gonzalez is alleging mental injury benefits stemming from four separate incidents occurring roughly over a two-month period, all of which involved his interactions with unruly teenagers. I'd like to focus on two arguments today. The first is that Gonzalez's mental injury is not compensable here because it was gradually occurring over the normal course of his employment relationship. And two, that Gonzalez assumed the risk here by voluntarily returning to his first bus route. With regard to the first point, does the law preclude the cumulative effect of these incidents? No. The law does allow recovery for cumulative incidents under the Runyon test. Right. But the CTA's position is that Gonzalez did not meet that standard here. Okay. Almost exactly a year ago, I appeared before this Court in the Timms case, another mental injury case involving the CTA. In that case, the claimant presented a single traumatic work-related incident, and this Court determined that that injury was compensable. However, this Court also held in Timms that when a mental injury occurs over time and in the normal course of the employment relationship, it is not compensable. Wait a minute. The normal course of... Do you tell me a bus driver's got to put up with this nonsense? Interaction with teenagers? These kids should have been arrested. Every one of them should have been loaded into a paddy wagon and hauled away. These bus drivers have to put up with this nonsense? Is that your argument? A CTA bus operator is obligated to drive through multiple neighborhoods in the city of Chicago. And sometimes incidents like this can occur. Not all... Sometimes. According to this, it happens every day at Englewood High School. They don't pay their fares. They get on the buses. They threaten your drivers. They disable your buses. They attack other passengers. And the bus driver is supposed to sit there and it's not supposed to affect him? The incidents that... You try it. First of all, when Gonzales became a bus operator, he was aware that he was going to have to drive through multiple neighborhoods within the city of Chicago, which is what the job entails. But there's no assumption of risk defenses, is there? The CTA asserts that in this case, Gonzales started out with the first route, then asked to be moved to the second route, which the CTA accommodated him by doing, and then immediately asked to go back to the first route because the first route involved more pay. In returning to the first route, Gonzales was well aware that he could experience other problems there because he had previously experienced problems there. So the CTA believes that Gonzales did, in fact, assume risk here. There's no assumption of risk defense in a workers' comp case? You know that. Okay. So that's a little far out. But besides that, didn't he also opine the claimant that he was losing some economic money because of the situation with the routes? Yes. Yes. But as arbitrators said, how bad could the first route be if Gonzales feared a reduction in pay more than the threat of bodily harm here? Let me ask you this. The Commission heard and accepted Dr. Kelly's expert psychological opinion, okay, that his current condition of post-traumatic stress disorder was causally related to his work experience, correct? Yes. Did the CTA present any contrary medical or psychological evidence to that? And if they didn't, so why couldn't the Commission rely on the unrebutted, uncontradicted testimony of Dr. Kelly? Because there's only one prong of the Runyon test. The other prong, which the CTA is disputing has been met here, is that Gonzales was subjected to greater stressors than that which all employees are subjected to in their day-to-day employment. It was not. According to these incidents, were not greater stressors than the average person driving the bus other places. Gonzales has a burden of proof here, and he did not show that he was subjected to greater stressors either than all other employees in general or as related to other CTA bus operators. He is not. Excuse me. The standard is you don't compare him to other bus operators. You compare him to the public in general. We specifically decided that issue in Diaz, which nobody cited. There was a police officer, and we said, you know, you don't compare to other police officers. You compare to the public in general in determining whether or not he's had the kind of pathfinder event. Well, the Diaz case specifically talks about police officers as being in a dangerous profession, and it said that police officers should not be held to a higher standard because they work in an inherently dangerous position. Isn't that your argument? You're saying, you know, all bus drivers are subjected to this kind of abuse, so it's part of his job. I'm saying it's not uncommon. But unlike police officers, bus operators do not operate in an inherently dangerous profession. A bus operator's job is to transport people. It occurs to me that any bus operator that operates in a route that stops at Englewood High School when that school is getting out is engaged in a pretty dangerous profession. But there are high schools all over the City of Chicago, and Englewood is just one of them. There are high schools all over the City of Chicago, but all the high schools don't have children that behave the way these children behave. Any time there's a bus operator who drives a city street in the City of Chicago, he or she never knows who's going to get on that bus. He or she has to be equipped to deal with a person who is discourteous, rude, or who behaves in an unruly manner. Here's the problem I'm having. Maybe you can answer this. How do we know that? Did you present any evidence at all at the arbitration hearing regarding the relative levels of stress and tension to which bus drivers are exposed? No. You didn't do that, did you? We did not do that. How do we know what the levels are in other neighborhoods? The CTA did not do that, and it is not the CTA's burden of proof. As Gonzalez admits on page 13 of his brief, Gonzalez, as a claimant, must prove every element of his claim. And he did not show that the stressors to which he was exposed were different or worse or uncommon for either all employees. He showed all the incidences that happened on his bus route. He came forward and he met that burden. You then come back and say, aha, this is the same that other bus drivers experienced. You don't have any proof of that, do you? Are you asking us to take judicial notice of what goes on in all the bus routes in the City of Chicago? No. But what Gonzalez could have done here and what he did not do here was he could have easily introduced evidence saying that this is typical for a CTA bus operator or it's not typical for a CTA bus operator, or he could have even asked Gordon, the transportation manager who testified here, whether or not this type of conduct was typical on buses. If he had asked Gordon, Gordon would have responded. Well, the commission bought his argument and they found it was fair, right? So now you have the relatively high hurdle of establishing that was against the manifest weight of the evidence. Forget about Gonzalez and what he proved or didn't prove. You have a commission fighting against you. So what do you do with that? The CTA's position here is that the standard of comparison should not have been to all employees, but it should have been to other similarly situated employees. As this Court has applied that standard, not only in the school cases, the Board of Ed cases, the Northwest Suburban case, the Matlock case, as well as the Runyon case, which is the only case cited by this Court, by the commission in this decision, in all of those cases, the Court compared the claimant to others who had the same or similar positions. It did not compare the claimant to all employees. And the CTA is arguing here that the comparison should have been to other CTA bus operators or other operators of common carriers and not the general public. And you're going to make a good-faith argument, straight-faith argument to us that what he was subjected to on these routes was the same as every other bus driver in the city of Chicago. Do you really want to go on the record recording and make that argument? Certainly there are some neighbors in the city that are worse than others and some neighbors in the city that are better than others. But his was not the only neighborhood that might have presented problems. And certainly problems can occur on the, you know, the best neighborhoods in the city of Chicago. So there's no way for a bus operator to know when he or she gets on the bus what kind of passenger he or she is going to drive, that it is their job to drive their passengers, regardless of whether or not they're discretious, rude, problematic, or unruly. Counsel, could I ask you something in regards to Pathfinder? Because it seems like we need to start with the basic and then get into the particulars here. The injuries at issue here, I think, were there four or five specific incidents? There were four incidents. Four. Are these the types of mental, mental injuries that were contemplated by Pathfinder? And specifically, I want to quote from Pathfinder that for a mental, mental claim, the claimant has to prove that he or she suffered a severe, sudden emotional shock traceable to a definite time, place, and cause, which causes psychological injury or harm. So are these four instances, these incidents, are these to be defined as sudden, severe emotional shocks? No. The commission did not analyze this case under Pathfinder. The commission analyzed this case under the Runyon standard. The CTA says that that is a proper standard. Runyon applies when there's a more gradually occurring trigger. There were four triggers here. And also when the psychological injuries occur also gradually, which is also the case in the Runyon context. So this is not a Pathfinder case. This is a Runyon case. We do not disagree with the commission on that issue. Okay. If I wanted to find the commission's decision, the arbitrator's decision, in the order on review by the circuit court, where would I locate that? That is, I believe it was appended to the brief that was filed by the Respondent. I believe that. By whom? By Gonzales. Uh-huh. And whose responsibility is it? Yeah. I apologize. I believe I erred in not providing that information. Yes, you did. It's a rule. I apologize for that. It should have been, probably. And I'm happy to supplement if the Court would prefer. Well, I want to compliment Gonzales' counsel for providing that. Being astute to see it wasn't there and put it in. But they're not responsible for, you know, catching the ball there. Okay? Yes. Thank you. I'd like to make one other point, if I may. And that is that applying a standard of what stressors all employees experience is an inconsistent judicial results, but it also could create uncertainty for litigants because they don't know what an all-employee stressor standard actually means. If there are not any further questions, I will respond to my opposing counsel's argument on rebuttal. We'll have time. Thank you. Thank you. Counsel, thank you for including that. Sure. Mr. Freeman. I'm Christopher Freeman. I represent Mr. Gonzales, the CTA employee. I just want to stress, based on counsel's argument, the degree to which this case falls squarely under the requirements of Runyon, okay? I think it's obvious from the record that what Mr. Gonzales was subjected to during the course of his employment at CTA was not even remotely normal for a bus driver, first of all. Well, how do we know that? Because, you know, I mean, we've been asking questions of counsel, very pointed questions, but she is telling us, well, that's all well and good, but the claimant didn't show that it was as outrageous as you were alleging. So how do we know? Do we take judicial notice of these things, or how do we know? Well, a couple of things. First of all, he testified that he had been driving a bus for two years prior to the onset of these issues. What happened was his garage had shut down. He transferred to a different garage. As it turned out, there ended up being sort of a racial element to this. He ended up in a predominantly African-American garage going through African-American neighborhoods. Mr. Gordon, the CTA manager, testified that of the six or seven hundred drivers out of that garage, only five to ten were not African-American. And so, as Mr. Gonzales testified, literally from the day he started these routes, he was subject to racially tinged threats, you know, insults, that sort of thing, threatening with violence, having his life threatened, that sort of thing. A strong-arm robbery occurred shortly after he started the route. If you watch the video, the robbery almost occurs on top of him. That's not something that's happening on the back of the bus. He's probably two or three feet away from him. So wait a minute. So are you saying in response to her argument that inherently in the claimant's testimony was reference to different routes and the differences between those routes? Well, what I'm saying is that he had driven different routes for two years prior to starting the route that's the subject of this and had no incidents. And so in that regard, he was basically living the life of a normal bus driver up until the route switched. Once the route switched, basically, for lack of a better term, all hell broke loose. And a lot of it had to do with his argument. That's exactly my response. Correct. And it's in the record. It's his own testimony. And secondly, as was previously brought up, a CTA manager testified in this case that he could have testified that what Mr. Gonzalez experienced is normal. It's just another day in the life of a bus driver. But he didn't. And he didn't because he couldn't because it's not true. Everybody knows, you know, you don't check your common sense at the door in these cases. And when you have this guy driving through Inglewood where there's five police cars stationed outside of a high school essentially pushing fighting kids onto the bus, that's just not a normal scenario for any type of employee. There were four incidents, all found to be compensable. True? True. The three incidents that occurred on the bus or in the immediate vicinity of the bus, you could put those in one category. The fourth involved a claimant receiving a letter indicating that he would need to testify in court. That was found to be a compensable psychological injury. Is that right? I believe it was at the arbitration level. I'm not sure. As counsel pointed out, the commission sort of changed the standard. So I can't say that the commission specifically found that incident to be compensable in a sort of sudden and shocking manner under Pathfinder. But my initial argument was that all four of these incidents, if you took them by standard, would be compensable in a sudden and shocking manner under Pathfinder. In this case, he was deathly afraid because essentially he'd be testifying in open court against these essentially criminals, and he has to continue to drive this route and they would know his identity. Essentially he would be a target at that point. Did you say that you would utilize a Pathfinder analysis? No, no. What I initially argued in my arbitration, a proposed arbitration decision, was that the case was compensable both under the gradual theory and under the fact that each specific incident constituted a sudden and shocking event. So you could argue it either way. That was essentially what it was. Well, putting Pathfinder aside, just with that fourth incident, is there any argument that you can make here that would include that within? Well, the argument is really the effect. What happened was he had a panic attack, and I think an ambulance had to come and essentially get him from the bus. They weren't sure if he was having a heart attack or not. It was really sort of a medically induced issue. Really where it's at now, though, it's a combination of these events that appeared over this period of time. Correct. And it's not as gradual, I don't believe, as counsel suggests. Everything is tied to the start of this new route. This entire world was turned over once he started this new route. And it wasn't just these four incidents. As he testified, these things were happening to him every day. These particular incidents, he just happened to have the save event button on the bus, and so we had video of them. But he was subject to these threats and these taunts and these, you know, everything else described in the brief every day that he was driving this particular route. Counsel also mentioned the fact that he had returned to the route after a short period on a different route. This was after the first incident. I think it's evident from the record that the change was never meant to be permanent, and I believe Manager Gordon testified to that. Under the union rules, he's not allowed to make some sort of a permanent change after he's made a pick. And so I think Gordon did, to his credit, try to accommodate the change for a small period of time. It was understood between both of them that the change wasn't ever going to be and couldn't be permanent. The other issue is that he was not making the same amount of money he was making when he was driving initially. I think there were a couple of hours there each day that he wasn't paid for, and that has something to do with the union rules. Frankly, I don't really know. But he wasn't being paid the same amount, and Manager Gordon admitted that on the cross-examination. In any event, you've got the Commission's finding in your favor, and she's got the hurdle to show that an opposite conclusion is clearly apparent, doesn't she? Correct. I just don't see how you could possibly come to that sort of conclusion based on the facts of this case. I think it's clearly evident from the record. Okay. Thank you, Counsel. Thank you. Counsel, you may reply. I would like to address three points made by opposing counsel. First of all, he testified that Gonzales had a prior route and that he didn't have any other bad experiences on that route involving unrelated teens or anything along those lines. That does not show what other CT bus operators experience. That only shows what he himself experienced. So that does not in any way comply with the running standard if you compare it to either all employees or all other bus operators. Second, as to this issue of whether or not the transportation manager testified to whether or not this route was worse or better than other routes, in footnote 7 in our reply brief,  about whether or not these conditions were normal for CT bus operators. If he had, and if he had answered in a certain way, then of course the claimant could have relied on that information, but he did not provide that information at all. Finally, Gonzales alleges that he was subjected to racial taunts and threats nearly every day, but as also was pointed out in our brief, he did not support that with any record site, nor did he mention that in any of the reports that he filled out after the four separate incidents which he claimed caused his mental injury. And for those reasons, the CTA stands on its brief, and for the reasons articulated here today, the CTA asks that this Court reverse the Commission's decision. Thank you. Thank you, Counsel Bolz. This matter will be taken under advisement and written disposition shall issue. Thank you.